JUDGE RAKOFF

Leo K. Barnes Jr. (LB-4396)
BARNES & BARNES, P.C.
1461 Franklin Avenue
Garden City, New York 11530
Tel: (516) 673-0674

Steven R. Thornton
Georgia State Bar No. 710630
*Pro Hac Vice* Application Forthcoming
THORNTON LAW FIRM, P.C.
Two Ravinia Drive, Suite 500
Atlanta, Georgia 30346
Tel: (678) 855-7148

Martin A. Rosen
Florida State Bar No. 586640
*Pro Hac Vice* Application Forthcoming
MARTIN A. ROSEN, P.A.
Post Office Box 3069
Placida, Florida 33946
Tel: (941) 698-1906

10 CV 3462



Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL LAMENSDORF and KATHY LAMENSDORF, Individually As Parents Of JOHN HUNT LAMENSDORF, Deceased, and MICHAEL LAMENSDORF, As Personal Representative of the Estate of JOHN HUNT LAMENSDORF, Deceased, <br><br> Plaintiffs, <br><br> v. <br><br> NEW YORK UNIVERSITY and EZRA M. SACKS, <br><br> Defendants. | CIVIL ACTION <br> DOCKET NO.: _____ <br><br><br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' COMPLAINT FOR DAMAGES

COMES NOW Michael Lamensdorf and Kathy Lamensdorf, individually as parents of their son, John Hunt Lamensdorf, Deceased, and Michael Lamensdorf, as Personal Representative of the Estate of John Hunt Lamensdorf, Deceased, Plaintiffs in this action, and file this Complaint for Damages against Defendants as follows:

## PARTIES AND JURISDICTION

1.

Plaintiffs Michael Lamensdorf and Kathy Lamensdorf are the natural parents of their son, John Hunt Lamensdorf, Deceased, and Michael Lamensdorf is the Personal Representative of the Estate of John Hunt Lamensdorf, Deceased. Plaintiffs are citizens and residents of the state of Florida and voluntarily submit themselves to the jurisdiction of this Court.

2.

Defendant New York University (hereinafter "NYU") is a non-profit entity organized and/or incorporated under the laws of the State of New York with its principal place of business in New York City, New York. Defendant NYU is subject to the jurisdiction of this Court and may be served with Summons and a copy of this Complaint as allowed by law.

3.

Defendant Ezra M. Sacks is a citizen and resident of the state of New York, and resides at 100 Bleecker Street, Apartment 11C, New York, New York 10012. Defendant Sacks is a Professor in the NYU undergraduate film and television program. Defendant Sacks is subject to the jurisdiction of this Court and may be served with Summons and a copy of this Complaint as allowed by law.

4.

Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because there is diversity of citizenship of the parties and the amount in controversy is greater than $75,000.00. Venue is proper in this Court under 28 U.S.C. § 1391 because both defendants reside in this district.

5.

That this action falls within one or more of the exemptions set forth in CPLR §1602.

## FACTUAL BACKGROUND

6.

Defendant New York University's Tisch School of the Arts is a prestigious undergraduate film school. Tisch School of the Arts (hereinafter "Tisch") is consistently ranked as the #1 film school in the United States by U.S. News & World Report and other school ranking services.

7.

Tisch film school offers its students a wide selection of the most technologically advanced facilities and resources available, including a Film Library, Animation Area, Teaching Soundstage, Television Soundstage, Live Television Studios, Production Center, and Post-Production Center.

8.

Defendant NYU describes the Tisch Production Center as "one of the largest filmmaking facilities on the Eastern Seaboard." The Production Center is run by 11 full-time employees and over 50 professionally trained technical assistants, and provides Tisch film students with much of the equipment needed to make a film.

9.

Defendant NYU encourages Tisch undergraduate film students to familiarize themselves with film production by volunteering to serve as crew members on each other's student films.

10.

Defendant Ezra M. Sacks is a NYU Professor who teaches courses for undergraduate film students at Tisch. One of courses taught by Defendant Sacks is Advanced Production Workshop II.

11.

Only Tisch film students meeting certain requirements and selected by Defendant Sacks can enroll in Advanced Production Workshop II. During this course, each student works on his Senior Thesis film project the entire semester, preparing a budget, getting the film crew together, and planning the film shoot. Defendant Sacks supervises, consults with, and guides the students through this process.

12.

Students in Advanced Production Workshop II submit their film projects to Defendant Sacks for approval. Once Defendant Sacks approves a student's film project, NYU provides that student with an allotment of money, use of NYU equipment, access to NYU facilities, and coverage under NYU-provided insurance for his Senior Thesis film project.

13.

For the Spring 2009 semester, NYU Tisch student Stephen Simon was admitted to Defendant Sacks' Advanced Production Workshop II course.

14.

Throughout the Spring 2009 semester, Stephen Simon, under the supervision and guidance of NYU through Defendant Sacks, revised and finalized the production plan for his

4

Senior Thesis film project, assembled a film crew of NYU undergraduate students, and obtained Defendant Sacks' and Defendant NYU's approval to make his Senior Thesis film. The budget for Stephen Simon's film, titled "Lovely Lying Lips," was in excess of $30,000.

15.

Simon's NYU film crew consisted of, in part, Andrew White, who held the position of Director of Lighting and Photography; Andres Cardona who held the position of Best Boy Electric; and Rachael Fung, who held the position of Producer.

16.

Plaintiffs' decedent John Lamensdorf, who also was a student in Defendant Sacks' Advanced Production Workshop II course, volunteered along with other NYU students to help his NYU classmate Stephen Simon with his NYU film project. John Lamensdorf held the position of Grip.

17.

In approximately mid- to late-May 2009, Simon took his allotment of money from NYU, was provided with various pieces of film equipment from NYU's productions facilities, rented more film equipment from Hand Held Productions in New York City, rented a van, and set out with approximately 20 NYU students to travel with him to the state of Georgia to make his NYU Senior Thesis film.

18.

Defendant Sacks knew that Stephen Simon's NYU film project included traveling to the state of Georgia to shoot the film. Defendant Sacks knew that the budget for Simon's NYU film project was in excess of $30,000. Defendant Sacks knew that Simon's NYU film project involved using multiple pieces of large, complex, and dangerous equipment. And, consistent with NYU's policy of encouraging Tisch undergraduate film students to volunteer to serve as

crew members on each other's student films, Defendant Sacks knew that Simon's NYU film project included a large film crew of many NYU undergraduate students who would travel to the state of Georgia to shoot the film.

19.

No teaching or staff member of Defendant NYU Tisch School of the Arts accompanied Stephen Simon and the many other NYU undergraduate students on the film project trip to Georgia to provide supervision, expertise, management, or guidance.

20.

Plaintiffs' decedent John Lamensdorf volunteered as an NYU student to help his NYU classmate Stephen Simon with his NYU film project.

21.

Once in Georgia, NYU film crew member Nicki Bertsch ordered via telephone from NES Rentals a Genie Z45/25RT aerial boom lift for rental.  The Genie Z45/25RT is a large, complex, and dangerous self-propelled articulating boom weighing over 13,000 lbs. with a working height of approximately 45 feet and a two-man working platform.

22.

On or about May 27, 2009, NES Rentals delivered the Genie Z45/25RT aerial lift to the film site in Monticello, Georgia.

23.

Before reaching the film site, Pen Pals Productions, a company affiliated with Stephen Simon, rented from Production Consultants & Equipment in Atlanta a MQ Power 45KVA generator, a pick-up truck to tow the generator, an electrical distribution box, and various electrical cables.

24.

On behalf of both Defendant NYU and Pen Pals, Stephen Simon and Rachael Fung secured the services of Jason Welin, a resident of Norcross, Georgia, to operate the aerial lift and help set up the film site with wires and cables for electrical equipment and lighting purposes. Welin had no formal training to operate the aerial lift, nor did he have any formal electrical license, training, background, or experience.

25.

The NYU film crew then departed the Atlanta area with a van full of film equipment and a large generator and pick-up truck, and traveled to Monticello, Georgia, a small town of approximately 2,500 residents located in Jasper County in central Georgia.

26.

Neither Defendant NYU nor Defendant Sacks notified anyone in Monticello that the NYU film crew would be arriving in Monticello in late May, 2009 to make a NYU student film. Specifically, Defendants NYU and Sacks failed to notify the Chamber of Commerce that its students were coming; they did not notify the Jasper County Sheriff's Department that they were coming; they did not notify the Jasper County Fire Department; they did not notify the Central Georgia EMC power company; and they did not notify any town official or newsperson that they were coming to Monticello to make a student film.

27.

Stephen Simon selected an abandoned house approximately five miles outside of Monticello in a rural area as the site for his NYU film project, "Lovely Lying Lips." The area near the abandoned house is deserted: there are no residences or businesses located anywhere nearby. Streetlights are non-existent, leaving the rural area in total darkness after sundown. The

house selected for the NYU film had been vacant for many years, and was in complete disrepair to the point of being hazardous in many respects.

28.

Most importantly, there were highly energized power lines stretching across the road directly in front of the abandoned house chosen as the NYU film site. Consistent with failing to alert anyone of their arrival to the area, Defendants NYU and Sacks also neglected to notify the local power company that the NYU crew would be filming in the area and using a 45-foot aerial lift within close proximity of overhead power lines.

29.

The NYU crew set up the site and filmed at the abandoned house outside of Monticello for the first day on Wednesday, May 27, 2009, and completed its activities several hours after midnight on May 28, 2009.

30.

On Thursday, May 28, 2009, the NYU film crew returned to the film site around 4:00 p.m. to set up for filming scenes at night. NYU student Andrew White told Jason Welin to position the aerial lift across the street under the overhead power lines in front of the house for use later that evening. Attached to the metal rail of the lift platform with a vice grip and metal chains, was a metal stand holding two large items: (1) a 12,000 watt spotlight to illuminate the front area of the house; and (2) a diffuser frame, which is a 4' x 6' metal frame with a piece of silk stretched side to side, to diffuse the intense light from the 12K spotlight. The spotlight and diffuser frame were approximately 4 feet above the platform, and would elevate higher than the platform as the operator raised the boom.

31.

As Welin and NYU student Andres Cardona began positioning the lift during daylight hours, they noticed overhead lines about 35 feet above the road that crossed over the road and were attached to large wooden poles. Despite the presence of overhead lines, Welin and Cardona placed the aerial lift in its general position directly below the overhead lines, knowing that they would move the lift into its precise position later when filming began.

32.

When filming was almost ready to begin around 9:30 p.m., NYU students White and Cardona began to give directions to Welin to raise and reposition the aerial lift from directly below the overhead power lines. At that same time, John Lamensdorf was placing a small metal light stand around the back of the house for lighting since the area was totally dark. John was located in back of the house approximately 300 feet away from the aerial lift. John could not see the aerial lift from where he was located, nor could he hear any discussion about raising the lift into its filming position.

33.

To receive electrical power, the spotlight attached to the aerial lift platform had a drop cable that was connected to a distribution box on the ground, which in turn was connected to the 45KVA generator and then out to other lighting equipment. The light John Lamensdorf was positioning, which was either provided by NYU or obtained using NYU-allotted supply money, was also connected to the distribution box and the generator.

34.

With direction from NYU student Andres Cardona on the ground, Jason Welin began to raise and position the aerial lift with the spotlight and diffuser frame. NYU student Andrew

White was further directing Cardona on where to position the lift for the "best light" on the front of the house.

35.

As Cardona was telling Welin via walkie-talkie to "Move left, right, up, down, etc.," the lift was approaching the overhead lines. While moving the aerial lift upwards, the diffuser frame made contact with the overhead lines and Cardona called up to Welin to stop.

36.

With further direction from students White and Cardona, Welin began moving the boom again toward the overhead lines. Seconds later, the diffuser frame struck the overhead power lines a second time, causing a 14,400-volt electrical surge to flow from the frame to the distribution box, to the generator, and then to the lights that were connected to the box. John Lamensdorf, who was touching a metal light stand approximately 300 feet away, received a massive electrical shock. The electrical surge extinguished all lights and caused several fires around the property.

37.

One of the NYU students called 911 and Cardona administered CPR to John Lamensdorf while waiting for the paramedics to arrive.

38.

An ambulance did not arrive at the scene until approximately 37 minutes after the incident. John Lamensdorf was examined at the scene and then transported to Jasper Memorial Hospital. John had sustained high voltage electrical burns to his forehead, face, abdomen, right leg, left thigh, and left knee. At the emergency room, staff members intubated John and attempted to regenerate a heart rhythm. These efforts were unsuccessful and John Lamensdorf was pronounced dead at 10:42 p.m. on May 28, 2009.

10

39.

The day after the incident, Defendant NYU sent a team of people, including Defendant Sacks, to Monticello, Georgia to counsel its students and retrieve its film equipment for return to NYU.

## COUNT ONE
## NEGLIGENCE AGAINST NEW YORK UNIVERSITY

40.

Plaintiffs re-allege and incorporate by reference paragraphs 1 through 39 above as if they were fully restated verbatim herein.

41.

NYU student Stephen Simon's Senior Thesis film project was an NYU curricular activity. The project was Simon's entire focus for Professor Ezra Sacks' Advanced Production Workshop II course for the Spring 2009 semester. Defendant NYU, by and through its Professor Sacks, approved Simon's Senior Thesis film and provided Simon an allotment of money, use of NYU film equipment, access to NYU facilities, and coverage under NYU-provided insurance for his film project. NYU encourages Tisch undergraduate film students, as part of their NYU education, to volunteer to serve as crew members on each other's student films. The preparation for and the making of Simon's NYU film involved many hazardous and dangerous conditions that were reasonably foreseeable to Defendant NYU.

42.

For the reasons stated above, Defendant NYU owed to its students involved in the production of this curricular film activity, including Plaintiffs' decedent John Lamensdorf, the duty to exercise reasonable care under the circumstances to protect its students from unreasonable risks of harm and from known and foreseeable dangerous conditions.

11

43.

Defendant NYU breached its duties owed to Plaintiffs' decedent in at least the following particulars:

a.  In failing to provide and require its students to complete technical safety training before leading or participating in filmmaking projects;

b.  In failing to impose spending restrictions on rental equipment for undergraduate filmmaking projects;

c.  In failing to impose geographical shoot radius restrictions for undergraduate filmmaking projects;

d.  In failing to provide its undergraduate filmmaking students with a set of guidelines identifying the components of a safe film set environment;

e.  In failing to instruct its undergraduate filmmaking students on how to construct and prepare a safe film set environment; and,

f.  In failing to send an NYU representative with experience in the management of physical film production, to accompany its students and to oversee, manage, and supervise the NYU student film project.  The NYU representative would have had a duty to do the following things, at a minimum:

   i.   Hire a licensed electrician to oversee all electrical and lighting aspects of the production.

   ii.  Hire a qualified and experienced aerial lift operator who would have positioned the lift well away from all overhead power lines.

   iii. Notify the appropriate entities in Monticello/Jasper County, Georgia that they would be present in the area and shooting a film, so that the local entities could implement any necessary

precautions, such as relocating or insulating the overhead power lines.

iv.    Implement an overall safety program for all on site to follow.

v.    Instruct the students as to the proper and safe methods of using the equipment.

vi.    Continuously monitor and supervise the site and its students for potential hazards and dangers.

44.

As a direct and proximate result of the breaches of duty by Defendant New York University, John Hunt Lamensdorf suffered fatal injuries and incurred damages, including medical and other necessary expenses, loss of future earnings, pre-death mental and physical pain and suffering, and funeral expenses.

45.

By reason of the foregoing, Plaintiffs are entitled to recover compensatory damages from Defendant NYU, in an amount to be proven at trial, for the full value of the life of the decedent John Hunt Lamensdorf, as well as for John Lamensdorf's loss of future earnings, pre-death pain and suffering, and medical and funeral expenses.

## COUNT TWO
## NEGLIGENCE AGAINST NYU PROFESSOR EZRA M. SACKS

46.

Plaintiffs re-allege and incorporate by reference paragraphs 1 through 45 above as if they were fully restated verbatim herein.

47.

NYU student Stephen Simon's Senior Thesis film project was an NYU curricular activity. The project was Simon's entire focus for Defendant Ezra Sacks' Advanced Production Workshop II course for the Spring 2009 semester. Throughout that semester, Defendant Sacks reviewed several versions of Stephen Simon's production plan for his Senior Thesis film project. Defendant Sacks knew that Simon's NYU film project included traveling to the state of Georgia to shoot the film. Defendant Sacks knew that the budget for Simon's NYU film project was in excess of $30,000. Defendant Sacks knew that Simon's NYU film project included using multiple pieces of large, complex, and dangerous equipment. And, consistent with NYU's policy of encouraging Tisch undergraduate film students to volunteer to serve as crew members on each other's student films, Defendant Sacks knew that Simon's NYU film project included a large film crew of many NYU undergraduate students who would travel unsupervised to the state of Georgia to shoot the film. Defendant Sacks approved Simon's Senior Thesis film project, which allowed Simon to obtain an allotment of money from NYU, use of NYU film equipment, access to NYU facilities, and coverage under NYU-provided insurance for his film project. Moreover, the preparation for and the making of Simon's NYU film involved many hazardous and dangerous conditions that were reasonably foreseeable to Defendant Sacks.

48.

For the reasons stated above, Defendant Sacks owed to the students involved in the production of this curricular activity, including Plaintiffs' decedent John Lamensdorf, the duty to exercise reasonable care under the circumstances to protect its students from unreasonable risks of harm and from known and foreseeable dangerous conditions.

49.

Defendant Ezra Sacks breached the duties he owed to Plaintiffs' decedent in at least the following particulars:

a. In failing to require the Simon NYU film crew students to complete a technical safety training course before participating in the Simon NYU film;

b. In failing to impose spending restrictions on rental equipment for the Simon NYU film;

c. In failing to impose geographical shoot radius restrictions for the Simon NYU film;

d. In failing to provide the Simon NYU film crew students with a set of guidelines identifying the components of a safe film set environment;

e. In failing to instruct the Simon NYU film crew students on how to construct and prepare a safe film set environment; and,

f. In failing to attend this Georgia film shoot and/or to send an NYU representative with experience in the management of physical film production, to accompany its students and to oversee, manage, and supervise the Simon NYU film project. The NYU representative would have had a duty to do the following things, at a minimum:

   i. Hire a licensed electrician to oversee all electrical and lighting aspects of the production.

   ii. Hire a qualified and experienced aerial lift operator who would have positioned the lift well away from all overhead power lines.

   iii. Notify the appropriate entities in Monticello/Jasper County, Georgia that they would be present in the area and shooting a film,

so that the local entities could implement any necessary precautions, such as relocating or insulating the overhead power lines.

iv.    Implement an overall safety program for all on site to follow.

v.    Instruct the students as to the proper and safe methods of using the equipment.

vi.    Continuously monitor and supervise the site and its students for potential hazards and dangers.

50.

As a direct and proximate result of the breaches of duty by Defendant Ezra M. Sacks, John Hunt Lamensdorf suffered fatal injuries and incurred damages, including medical and other necessary expenses, loss of future earnings, pre-death mental and physical pain and suffering, and funeral expenses.

51.

By reason of the foregoing, Plaintiffs are entitled to recover compensatory damages from Defendant Sacks, in an amount to be proven at trial, for the full value of the life of the decedent John Hunt Lamensdorf, as well as for John Lamensdorf's loss of future earnings, pre-death pain and suffering, and medical and funeral expenses.

## COUNT THREE
## VICARIOUS LIABILITY OF NEW YORK UNIVERSITY

52.

Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 above as if they were fully restated verbatim herein.

53.

As crew members on a film set where large pieces of motorized equipment and massive amounts of electrical power were in use, NYU students Stephen Michael Simon, Andrew White, Andres Cardona, Rachael Fung, and NYU employee/agent Jason Welin owed to those on the film set, including Plaintiffs' decedent John Lamensdorf, the duty to exercise reasonable care under the circumstances to protect others from unreasonable risks of harm and from known and foreseeable dangerous conditions.

54.

Simon, White, Cardona, and Fung breached their duties they owed to Plaintiffs' decedent in at least the following particulars:

    a.  In failing to hire a licensed electrician to oversee all electrical and lighting aspects of the production;

    b.  In failing to hire a qualified and experienced aerial lift operator who would have positioned the lift well away from all overhead power lines;

    c.  In hiring a person to operate the aerial lift and assist with electrical and lighting activities who had no formal training to operate the lift, and had no formal electrical license, training, background, or experience;

    d.  In renting equipment they were not qualified to safely operate;

    e.  In placing the aerial lift near overhead power lines;

    f.  In maneuvering the aerial lift around power lines in the dark; and,

    g.  In striking the energized power lines twice while operating the lift.

55.

Moreover, Jason Welin breached the duties he owed to Plaintiffs' decedent in at least the following particulars:

17

a.  In accepting employment as a gaffer/electrician when he was not qualified to act as such;

b.  In placing the aerial lift near overhead power lines;

c.  In attempting to operate the aerial lift near overhead power lines when he was not licensed as an electrician, or trained, experienced, or knowledgeable to do so;

d.  In attempting to maneuver the aerial lift around overhead power lines in the dark; and,

e.  In striking the energized power lines twice while operating the lift.

56.

As a direct and proximate result of the breaches of duty by Stephen Michael Simon, Andrew White, Andres Cardona, Rachael Fung, and Jason Welin, John Hunt Lamensdorf suffered fatal injuries and incurred damages, including medical and other necessary expenses, loss of future earnings, pre-death mental and physical pain and suffering, and funeral expenses.

57.

At all relevant times, Ezra Sacks, Stephen Michael Simon, Andres Cardona, Andrew White, Rachael Fung, and Jason Welin were employees and/or agents of Defendant NYU with respect to the incident-in-suit, and these individuals committed negligent acts and omissions within the course and scope of their employment and/or agency with Defendant NYU. Accordingly, Defendant NYU is liable for the negligent acts and omissions of Sacks, Simon, Cardona, White, Fung, and Welin under the theory of *respondeat superior*.

58.

By reason of the foregoing, Plaintiffs are entitled to recover compensatory damages from Defendant NYU, in an amount to be proven at trial, for the full value of the life of the decedent

John Hunt Lamensdorf, as well as for John Lamensdorf's loss of future earnings, pre-death pain and suffering, and medical and funeral expenses.

**COUNT FOUR**
**COMBINED AND CONCURRING CONDUCT CAUSING INJURY AND DEATH**

59.

Plaintiffs re-allege and incorporate by reference paragraphs 1 through 58 above as if they were fully restated verbatim herein.

60.

The conduct of Defendants New York University and Ezra M. Sacks combined and concurred to cause the injuries and death of John Hunt Lamensdorf.

61.

As a direct and proximate result of the combined and concurring conduct of Defendants New York University and Ezra M. Sacks, Defendants are jointly and severally liable to Plaintiffs, thereby entitling Plaintiffs to an award of compensatory damages from in favor of Plaintiffs and against Defendants, and each of them, in an amount to be proven at trial, for the full value of the life of the decedent John Hunt Lamensdorf, as well as for John Lamensdorf's loss of future earnings, pre-death pain and suffering, and medical and funeral expenses.

**COUNT FIVE**
**PUNITIVE DAMAGES AGAINST DEFENDANTS**
**NEW YORK UNIVERSITY AND EZRA SACKS**

62.

Plaintiffs re-allege and incorporate by reference paragraphs 1 through 61 above as if they were fully restated verbatim herein.

19

63.

Defendant NYU's conduct, as described in this Complaint generally and in paragraphs 40-42 specifically, exhibits an entire lack of care and a conscious disregard for the safety of its students and others participating in the NYU film project that resulted in the death of Plaintiffs' decedent John Lamensdorf.

64.

Defendant Ezra Sacks' conduct, as described in this Complaint generally and in paragraphs 46-48 specifically, exhibits an entire lack of care and a conscious disregard for the safety of the NYU students and others participating in the NYU film project that resulted in the death of Plaintiffs' decedent John Lamensdorf.

65.

As a direct and proximate result of the wrongful conduct of Defendants NYU and Sacks, Plaintiff is entitled to a separate judgment for punitive damages against each of these defendants, to deter similar conduct in the future and to punish Defendants for their wrongful acts, in separate amounts for each Defendant to be determined by the enlightened conscience of the finder of fact.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray and demand, as follows:

1.   That Process and Summons issue, as provided by law, requiring Defendants to appear and answer Plaintiffs' Complaint;

2.   That service be had upon Defendants as provided by law;

3.   Under Count One and Three, that the Court award and enter a judgment in favor of Plaintiffs and against Defendant NYU for compensatory damages in an amount to be proven at trial;

4.    Under Count Two, that the Court award and enter a judgment in favor of Plaintiffs and against Defendant Ezra Sacks for compensatory damages in an amount to be proven at trial;

5.    Under Count Four, that the Court award and enter a judgment in favor of Plaintiffs and against both Defendants, jointly and severally, for compensatory damages in an amount to be proven at trial;

6.    Under Count Five, that Plaintiffs be awarded punitive damages against Defendants NYU and Sacks separately, each in an amount to be determined by a jury of Plaintiffs' peers that is sufficient to punish and deter;

7.    That Plaintiffs have a trial by a jury as to all issues; and,

8.    That Plaintiffs have such other and further relief as the Court may deem just and proper.

This 22nd day of April, 2010.

Respectfully submitted,

By:    /s/    Matthew J. Barnes
Leo K. Barnes, Jr. (LB-4396)
Matthew J. Barnes (MB-4399)
BARNES & BARNES, P.C.
1461 Franklin Avenue
Garden City, New York 11530
Tel: (516) 673-0674
Fax: (516) 467-3126
E-mail: lkb@barnespc.com

By:    /s/    Steven R. Thornton/MJB
Steven R. Thornton
Georgia State Bar No. 710630
THORNTON LAW FIRM, P.C.
Two Ravinia Drive, Suite 500
Atlanta, Georgia 30346
Tel: (678) 855-7148
Fax: (678) 855-7149
E-mail: steve@thornton-lawfirm.com

By:    /s/      Martin A. Rosen/MJB
       Martin A. Rosen
       Florida State Bar No. 586640
       MARTIN A. ROSEN, P.A.
       Post Office Box 3069
       Placida, Florida 33946
       Tel: (941) 698-1906
       E-mail: marosenlaw@yahoo.com

       Attorneys for Plaintiffs